IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARY GUIDER-SHAW, individually and on behalf of all others similarly situated<br><br>      Plaintiff,<br>  v.<br><br>EQUIFAX INC.,<br><br>      Defendant. | Case No. 1:22-cv-5733 |

## CLASS ACTION COMPLAINT

Plaintiff Mary Guider-Shaw ("Plaintiff"), individually and on behalf of all other persons similarly situated, files this Class Action Complaint against Defendant Equifax Inc. ("Defendant" or "Equifax") for violations of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Plaintiff's claims arise from Defendant's practice of knowingly disclosing to a third party, Meta Platforms, Inc. ("Facebook"), data containing Plaintiff's and other digital-subscribers Class Members' (i) personally identifiable information or Facebook ID ("FID") and (ii) the computer file containing video and its corresponding URL viewed ("Video Media") (collectively, "Personal Viewing Information"). Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1. This is a consumer privacy action against Equifax Inc., for violating the VPPA by disclosing its digital subscribers' identities and Video Media to Facebook without proper consent.

2. The VPPA prohibits "video tape service providers," such as Equifax, from knowingly disclosing consumers' personally identifiable information, including "information

which identifies a person as having requested or obtained specific video materials or services from a video tape provider," without express consent in a standalone consent form.

3. Like other businesses with an online presence, Defendant collects and shares the personal information of visitors to its website and mobile application ("App") with third parties. Defendant does this through cookies, software development kits ("SDK"), and pixels. In other words, digital subscribers to Equifax have their personal information disclosed to Defendant's third-party business partners.

4. Equifax collects and shares subscribers' personal information using a "Facebook Pixel." A Facebook Pixel is a snippet of programming code that, once installed on a webpage or mobile application, tracks users as they navigate through a website or app and sends information regarding the user's activity to Facebook.

5. In this case, the information shared with Facebook includes the title of the prerecorded video the subscriber watched, and most notably, the subscribers' FID. A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interest, work history, relationship status, and other details.

6. Importantly, Equifax discloses the subscriber's FID and viewed prerecorded Video Media to Facebook together in a single transmission. This occurs even when the digital subscriber has not shared (nor consented to share) such information. Because the subscriber's FID uniquely identifies an individual's Facebook user account, Facebook—or any other ordinary person—can use it to quickly and easily locate, access, and view subscriber's Facebook profile. In other words, the Facebook Pixel allows Facebook to know what Video Media one of its users has viewed on Equifax's digital platforms.

7. Equifax subscribers do not consent to the dissemination of their viewed Video Media to a third party through a standalone consent form, as required by the VPPA. As a result, Equifax violates the VPPA by disclosing this information to Facebook.

8. Defendant chose to disregard Plaintiff's and hundreds of thousands of other Equifax subscribers' statutorily protected privacy rights by releasing their sensitive data to Facebook. Accordingly, Plaintiff brings this class action for legal and equitable remedies to redress and put a stop to Defendant's practices of intentionally disclosing its subscribers' Personal Viewing Information to Facebook in knowing violation of VPPA.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

10. This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of Defendant.

11. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391 because Defendant does business in and is subject to personal jurisdiction in this District. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in or emanated from this District.

## THE PARTIES

12. Plaintiff Mary Guider-Shaw is a natural person and a citizen of the State of Illinois. Plaintiff has visited Equifax.com since at least October 6, 2021 and upon information and belief became a digital subscriber at or around that time. Plaintiff has had a Facebook account from

approximately 2004 to the present. During the relevant time period she has used her Equifax.com digital subscription to view Video Media through Equifax.com while logged into her Facebook account. By doing so, Plaintiff's Personal Viewing Information was disclosed to Facebook pursuant to the systematic process described herein. Plaintiff never gave Defendant express written consent to disclose her Personal Viewing Information.

13. Defendant Equifax Inc.:

　　a. Is one of the "Big Three" American consumer credit reporting agencies headquartered at 1550 Peachtree St. NW Atlanta, Georgia, 30309.

　　b. Is a "credit bureau gathering and collating data about each United States citizen for the purpose of selling it to creditors and lenders." [1]

　　c. Manages about 800 million consumer records and 88 million business files. *Id*.

　　d. Offers instructional and educational resources on www.equifax.com for consumers to better manage their finances and improve their credit score.

　　e. These educational resources include written articles and prerecorded videos.

　　f. Equifax.com is used by numerous U.S. digital media viewers.

　　g. Through Equifax.com, Defendant delivers and, indeed, is in the business of delivering prerecorded video content to its digital subscribers.

**FACTUAL BACKGROUND**

**I. Equifax's Digital Subscriptions**

14. Defendant owns and operates www.equifax.com, a website geared towards providing articles and prerecorded video content to users on Defendant's credit report services and

---

[1] *See* "What is Equifax, Everything to Know About the Credit Bureau" *available at* https://www.idstrong.com/sentinel/what-is-equifax-everything-to-know-about-the-credit-bureau/#:~:text=Despite%20the%20lofty%20message%2C%20Equifax%20is%20a%20credit,they%20use%20algorithms%20to%20calculate%20a%20credit%20score. (last accessed October 17, 2022)

4

general financial advice. E.g., understanding credit scores, fraud and identity theft, debt management, loans, etc.

15. Defendant offers multiple subscription options for users including free and paid services so users can receive credit score reports, credit report locks, fraud alerts, and identity theft insurance.[2]

16. To register for any Equifax account, users provide their personal information, including but not limited to their name, phone number, date of birth, home address, email address, and social security number.

17. On information and belief, all subscribers provide Defendant with their IP address, which is a unique number assigned to all information technology connected devices, that informs Defendant as to subscribers' city, zip code and physical location.

18. Subscribers may provide to Defendant the identifier on their mobile devices and/or cookies stored on their devices.

19. When opening an Equifax account, Defendant does not disclose to its subscribers that it will share their Personal Viewing Information with third parties, such as Facebook. Subscribers are also not asked to consent to such information sharing upon opening an account.

20. After becoming a subscriber, viewers have access to a variety of prerecorded Video Media on Defendant's website.

21. Notably, once a subscriber signs in and watches prerecorded Equifax Video Media, the subscriber is not provided with any notification that their Personal Viewing Information is being shared. Similarly, Defendant also fails to obtain subscribers' written consent to collect their

---

[2] *See* https://www.equifax.com/personal/products/login-product-comparison/

Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

## II. Defendant Admits It Collects and Discloses Personal Viewing Information of Digital Subscribers to Third Parties.

22. The operative Privacy Statement for Equifax.com states that it collects the following categories of personal data:

> "Name and contact information; Identifiers; Demographic information; Payment information; Financial information; Commercial information; Internet or other similar network activity; Device information; Professional or employment-related information; Support information; Education information; Inferences drawn from personal data."[3]

23. Defendant's Privacy Statement further states that Equifax, third party service providers, and partners:

> "use 'cookies' web beacons, and other technologies for similar purposes. We have agreements with companies, sometimes called 'Ad Networks,' that serve advertising on behalf of other companies. These Ad Networks may place or recognize a cookie, called a 'third party cookie,' on a visitor's computer when they visit a website not affiliated with us that has a contract with them. Ad Networks use cookies to understand web usage patterns of people who see advertisements, to control the sequence of advertisements they see, to provide them with the most relevant advertising, and to make sure they don't see the same ad too many times. Ad Networks may connect information about pages visited on our site with information about pages visited on other sites. They show advertising based on this combined information, including advertising for our products."

24. Importantly however, the VPPA requires that consent be obtained in a form "distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710. Subscribers to Equifax are not given a standalone or any consent form disclosing Defendant's practices at issue and requesting subscriber consent. Hence, no subscriber has consented to Equifax's offending practice of sharing video preferences with third parties.

---

[3] *See* https://www.equifax.com/privacy/privacy-statement/

**III.     How Defendant Disseminates Subscribers' Personal Viewing Information**

**1.     Tracking Pixels**

25.     Websites and apps use Facebook's pixel and SDK to collect information about users' devices and activities and send that to Facebook. Facebook then uses that information to show the user targeted ads.

26.     The Facebook tracking pixel, also known as a "tag" or "web beacon" among other names, is an invisible tool that tracks consumers' actions on Facebook advertisers' websites and reports them to Facebook. It is a version of the social plugin that gets "rendered" with code from Facebook. To obtain the code for the pixel, the website owner tells Facebook which website events it wants to track (e.g., Video Media) and Facebook returns corresponding Facebook pixel code for the advertiser to incorporate into its website.

27.     Facebook benefits from websites like Equifax installing its Pixel. When the Pixel is installed on a business's website, the business has a greater incentive to advertise through Facebook or other Meta-owned platforms, like Instagram. In addition, even if the business does not advertise with Facebook, the Pixel assists Facebook in building more fulsome profiles of its own users, which in turn allows Facebook to profit from providing more targeted ads. The Pixel is installed on websites all over the internet and, accordingly, provides Facebook with information about its users' preferences, other distinguishing traits, and web-browsing activities outside of Meta-owned platforms.

28.     Using the Facebook pixel likewise benefits Equifax by improving its ability to promote its content and services to its subscribers.

29.     Defendant installed the Facebook tracking pixel, which enables it to disclose Plaintiff's and Class Members' Personal Viewing Information to Facebook, because it benefits

7

financially from the advertising and information services that stem from use of the pixel. When a Equifax subscriber enters the website or App and watches prerecorded Video Media, the website or App sends to Facebook certain information about the viewer, including, but not limited to, their identity and the media content the digital subscriber watched. Specifically, Equifax sends to Facebook the video content name, its URL, and, most notably, the viewers' Facebook ID.

### 2. Facebook ID ("FID")

30. An FID is a unique and persistent identifier that Facebook assigns to each user. With it, anyone ordinary person can look up the user's Facebook profile and name. When a Facebook user with one or more personally identifiable FID cookies on their browser views prerecorded Video Media from Equifax on the website or app, Equifax, through its website code, causes the digital subscriber's identity and viewed Video Media to be transmitted to Facebook by the user's browser. This transmission is not the digital subscriber's decision, but results from Defendant's purposeful use of its Facebook tracking pixel by incorporation of that pixel and code into Equifax's website or App. Defendant could easily program the website and App so that this information is not automatically transmitted to Facebook when a subscriber views prerecorded Video Media. However, it is not Defendant's financial interest to do so because it benefits financially by providing this highly sought-after information.

31. Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile. Simply put, with only an FID and the video content name and URL—all of which Defendant knowingly and readily provides to Facebook without any consent from the digital subscribers—any ordinary person could learn the

8

identity of the digital subscriber and the specific video or media content they requested from Equifax.

32. At all relevant times, Defendant knew that the Facebook pixel disclosed Personal Viewing Information to Facebook. This was evidenced from, among other things, the functionality of the pixel, including that it enabled Equifax's website and accompanying App to show targeted advertising to its digital subscribers based on the products those digital subscribers had previously viewed on the website, including Video Media consumption, for which Defendant received financial remuneration.

## IV. Defendant Unlawfully Discloses Its Subscribers' Personal Viewing Information to Facebook.

33. Defendant maintains a vast digital database comprised of its digital subscribers' Personal Viewing Information, including the names and e-mail addresses of each digital subscriber and information reflecting the Video Media that each of its digital subscribers viewed.

34. Defendant is not sharing anonymized, non-personally identifiable data with Facebook. To the contrary, the data it discloses is tied to unique identifiers that track specific Facebook users. Importantly, the recipient of the Personal Viewing Information—Facebook—receives the Personal Viewing Information as one data point. Defendant has thus monetized its database by disclosing its digital subscribers' Personal Viewing Information to Facebook in a manner allowing it to make a direct connection—without the consent of its digital subscribers and to the detriment of their legally protected privacy rights.

35. Critically, the Personal Viewing Information Defendant discloses to Facebook allows Facebook to build from scratch or cross-reference and add to the data it already has in their own detailed profiles for its own users, adding to its trove of personally identifiable data.

36. These factual allegations are corroborated by publicly available evidence. For instance, as shown in the screenshot below, a user visits Equifax's website and clicks on a prerecorded video titled "A Guide to Equifax Lock & Alert".



*Pictured above: The prerecorded video titled "A Guide to Equifax Lock & Alert" (taken from Equifax.com on or about October 13, 2022).*

37. As demonstrated below, once the user clicks on and watches the prerecorded video, Equifax sends to Facebook the content name of the video the subscriber watched, the URL, the subscriber's FID, and indicates that the subscriber has played the prerecorded video.

```
▼ Request Headers
    :authority: www.facebook.com
    :method: GET
    :path: /tr/?id=1157594847740986&ev=PageView&dl=https%3A%2F%2Fwww.equif
    ax.com%2Fpersonal%2Fproducts%2Fcredit%2Fcredit-lock-alert%2F&rl=&if=f
    alse&ts=1665697231299&sw=1440&sh=900&v=2.9.84&r=stable&a=tmensighten&
    ec=0&o=29&it=1665697231280&coo=false&dpo=LDU&dpoco=0&dpost=0&eid=8909
    9903-b335-40f5-a118-e2806f608f39&rqm=GET
    :scheme: https
    accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=
    0.8
    accept-encoding: gzip, deflate, br
    accept-language: en-US,en;q=0.9
    cookie: sb=wXxIY8jvG0TgEgC2TdtLaQOk; datr=xHxIY280reqfXXkOM4xIVZak; dp
    r=2; locale=en_US; c_user=32806956; xs=4%3A9Ul7ujGJ_F_Esw%3A2%3A16656
    94930%3A-1%3A2875; fr=0yk2br6Qa8pj1BKkB.AWWQBDFB58WxZRup8k3kYQd159A.B
    i6a3e.1B.AAA.0.0.BjSHzU.AWX0nn5XJzk
    referer: https://www.equifax.com/personal/products/credit/credit-lock-a
    lert/
    sec-ch-ua: "Chromium";v="104", " Not A;Brand";v="99", "Google Chrome";
    v="104"
    sec-ch-ua-mobile: ?0
    sec-ch-ua-platform: "macOS"
    sec-fetch-dest: image
    sec-fetch-mode: no-cors
    sec-fetch-site: cross-site
```

*HTTP single communication session sent from the device to Facebook, reveals the video name, URL, and the viewer's FID (c_user field)*



*Pictured above: a screenshot proving the c_user number sent by Equifax to Facebook is the FID of the Named Plaintiff.*

38. As a result of Defendant's data compiling and sharing practices, Defendant has knowingly disclosed to Facebook for its own personal profit the Personal Viewing Information of Defendant's digital subscribers, together with additional sensitive personal information.

39. Defendant does not seek its digital subscribers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) and its subscribers remain unaware that their Personal Viewing Information and other sensitive data is being disclosed to Facebook.

40. By disclosing its digital subscribers Personal Viewing Information to Facebook – which undeniably reveals their identity and the specific prerecorded video materials they requested from Defendant's website – Defendant has intentionally and knowingly violated the VPPA.

12

## V. Plaintiff's Experience

41. Plaintiff Mary Guider-Shaw has been subscribed to an Equifax account since at least October 6, 2021 when she was planning to refinance a loan. Plaintiff became a subscriber of Equifax by providing, her name, email address, and any cookies associated.

42. Plaintiff has had a Facebook account since approximately 2004. From at least October 2021 to the present, Plaintiff viewed prerecorded Video Media via Equifax's website.

43. Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Personal Viewing Information to Facebook. Plaintiff has never been provided written notice that Defendant discloses its digital subscribers' Personal Viewing Information, or any means of opting out of such disclosures of her Personal Viewing Information. Defendant nonetheless knowingly disclosed Plaintiff's Personal Viewing Information to Facebook.

44. Because Plaintiff is entitled by law to privacy in her Personal Viewing Information, Defendant's disclosure of her Personal Viewing Information deprived Plaintiff of the full set of benefits to which she is entitled. Plaintiff did not discover that Defendant disclosed her Personal Viewing Information to Facebook until October 2022.

## CLASS ACTION ALLEGATIONS

45. Plaintiff brings this action individually and on behalf of all others similarly situated as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All persons in the United States with a digital subscription to an online website owned and/or operated by Defendant that had their Personal Viewing Information disclosed to Facebook by Defendant.

46. Excluded from the Class are Defendant, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of

them have a controlling interest, as well as all judicial officers assigned to this case as defined by 28 USC § 455(b) and their immediate families.

47. This action is properly maintained as a class action under Federal Rules of Civil Procedure 23(a) because:

    A.    The class is so numerous that joinder of all members is impracticable;

    B.    There are questions of law or fact that are common to the class;

    C.    The claims of the Plaintiff are typical of the claims of the class; and,

    D.    The Plaintiff will fairly and adequately protect the interests of the class.

### Numerosity

48. Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Plaintiff believes that there are hundreds of thousands of members of the Class widely dispersed throughout the United States. Class members can be identified from Defendant's records and non-party Facebook's records.

### Typicality

49. There is a well-defined commonality of interest in the substantial questions of law and fact concerning and affecting the Class in that Plaintiff and all members of the Class have been harmed by Equifax's failure to comply with the VPPA. The common questions of law and fact include, but are not limited to the following:

    A.    Whether Defendant knowingly disclosed Class members' Personal Viewing Information to Facebook;

    B.    Whether the information disclosed to Facebook concerning Class members' Personal Viewing Information constitutes personally identifiable information under the VPPA;

    C.    Whether Defendant's disclosure of Class members' Personal Viewing Information to Facebook was knowing under the VPPA;

      D.      Whether Class members consented to Defendant's disclosure of their Personal Viewing Information to Facebook in the manner required by 18 U.S.C. § 2710(b)(2)(B); and

      E.      Whether the Class is entitled to damages as a result of Defendant's conduct.

50. Plaintiff anticipates that Equifax will raise defenses that are common to the class.

### Adequacy

51. Plaintiff will fairly and adequately protect the interests of all members of the class, and there are no known conflicts of interest between Plaintiff and the class members. Plaintiff, moreover, has retained experienced counsel that are competent in the prosecution of complex litigation and who have extensive experience acting as class counsel.

### Typicality

52. Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class were harmed by the same wrongful conduct by Defendant in that Defendant caused Personal Viewing Information to be disclosed to Facebook without obtaining express written consent. Her claims are based on the same legal theories as the claims of other Class members.

### Predominance and Superiority

53. The common questions identified above predominate over any individual issues, which will relate solely to the quantum of relief due to individual class members. A class action is superior to other available means for the fair and efficient adjudication of this controversy because individual joinder of the parties is impracticable. Class action treatment will allow a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense if these claims were brought individually. Moreover, as the damages suffered by each class member are relatively small

in the sense pertinent to class action analysis, the expenses and burden of individual litigation would make it difficult for individual class members to vindicate their claims.

54. Additionally, important public interests will be served by addressing the matter as a class action. The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially more than if claims are treated as a class action. Prosecution of separate actions by individual class members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Equifax and/or substantially impair or impede the ability of class members to protect their interests. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

## FIRST CAUSE OF ACTION

**Violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710**

55. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

56. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

57. As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

58. Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

59. As defined in 18 U.S.C. § 2710(a)(3), "personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

60. Defendant knowingly caused Personal Viewing Information, including FIDs, concerning Plaintiff and Class members to be disclosed to Facebook. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class member to Facebook as an individual who viewed Equifax's prerecorded Video Media, including the specific video materials requested from the website.

61. As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged in the preceding paragraphs, Plaintiff subscribed to Equifax's newsletter that provides Video Media content to the digital subscriber's desktop, tablet, and mobile device. Plaintiff is thus a "consumer" under this definition.

62. As set forth in 18 U.S.C. § 27109(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Defendant failed to obtain informed, written consent under this definition.

63. In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the

consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

64. By disclosing Plaintiff's and the Class's Personal Viewing Information, Defendant violated Plaintiff's and the Class members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

65. As a result of the above violations, Defendant is liable to the Plaintiff and other Class members for actual damages related to their loss of privacy in an amount to be determined at trial or alternatively for "liquidated damages not less than $2,500 per plaintiff." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Mary Guider-Shaw respectfully requests that this Court enter and Order:

A. Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff Mary Guider-Shaw as Class Representative, and appointing Stephan Zouras, LLP as Class Counsel;

B. Declaring that Equifax's actions, as set forth above, violate the VPPA, 18 U.S.C. § 2710(c)(2)(D);

C. Awarding statutory damages of $2,500 to Plaintiff and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

D. Awarding punitive damages, as warranted, in an amount to be determined at trial, 18 U.S.C. § 2710(c)(2)(B);

E. Awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

F. Awarding Plaintiff and the Class their reasonable attorneys' fees and other litigation expenses, 18 U.S.C. § 2710(c)(2)(C);

G. Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

H. Awarding such other and further relief as equity and justice may require.

Date: October 18, 2022                                   Respectfully Submitted,

*/s/ Ryan F. Stephan*
Ryan F. Stephan
James B. Zouras
Mohammed A. Rathur
**STEPHAN ZOURAS, LLP**
100 N. Riverside Plaza, Suite 2150
Chicago, Illinois 60606
312.233.1550
312.233.1560 *f*
rstephan@stephanzouras.com
jzouras@stephanzouras.com
mrathur@stephanzouras.com
Firm ID: 43734

Brandon M. Wise – IL Bar # 6319580
Adam Florek – IL Bar # 6320615
**PEIFFER WOLF CARR**
**KANE CONWAY & WISE, LLP**
73 W. Monroe, 5th Floor
Chicago, IL 60604
T: 312-444-0734
bwise@peifferwolf.com
aflorek@peifferwolf.com

**ATTORNEYS FOR PLAINTIFF**

## **CERTIFICATE OF SERVICE**

      I, the attorney, hereby certify that on October 18, 2022, I filed the attached with the Clerk of the Court using the ECF system which will send such filing to all attorneys of record.

*/s/ Ryan F. Stephan*
